# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | |
|---|---|
| **SHAWN ANDREWS and CONSTANT ANDREWS,**<br><br>         Plaintiffs,<br><br>     v.<br><br>**RAM MEDICAL, INC., MEDLINE INDUSTRIES, INC., C.R. BARD, INC., and DAVOL, INC.,**<br><br>         Defendants. | Civil Action No. 7:11-CV-147 (HL) |

## ORDER

Before the Court is non-party Tift Regional Medical Center's ("Tift Regional") Motion to Quash. For the reasons stated below, the Motion is granted as to Request 6. The arguments regarding the remaining nine subpoena requests are found to be moot based on the parties' agreement as to those requests.

### I.   BACKGROUND

This is a products liability case that revolves around the implantation of allegedly counterfeit surgical mesh in Plaintiff Mrs. Shawn Andrews. In October 2009, Mrs. Andrews went to the South Georgia Surgical Clinic for a hernia repair, and during this procedure, she was implanted with allegedly counterfeit mesh. As a result, she claims to have suffered numerous health complications. She and her husband, Mr. Constant Andrews, filed this suit against Defendants RAM

Medical, Inc. and Medline Industries Inc., both distributors of medical products, as well as CR Bard, Inc. and Davol, Inc., both manufacturers of medical products.

Non-party Tift Regional Medical Center ("Tift Regional") filed this Motion to Quash in opposition of a subpoena served on it by Defendant Medline Industries, Inc. ("Medline"). Medline served Tift Regional with a subpoena listing ten requests for documents. Tift Regional filed this Motion to Quash, objecting to almost all of Medline's requests. However, in a telephone conference call held on May 10, 2012,[1] the parties informed the Court that many of the issues raised by Tift Regional in its Motion to Quash were resolved by the parties without Court involvement. Only two issues were left remaining: (1) whether any of the requests listed in the subpoena potentially violate HIPAA and (2) whether the peer review or medical review privilege applies to Request 6 of the subpoena, which seeks information about hospital-acquired infections at Tift Regional. These issues are addressed below.

II.   **DISCUSSION**

  a. **Potential HIPAA Violations**

In the telephone conference call, Medline stated that it does not intentionally seek any HIPAA-protected information. Thus, the Court orders Tift Regional to produce any documents that are responsive to Medline's requests,

---

[1] The parties to the telephone conference call were the Court, Medline, Tift Regional, and Plaintiffs Shawn and Constant Andrews.

and if a potential HIPAA violation is discovered, the document should be redacted to exclude patient information before disclosing the document to Medline.

### b. Request 6: Information regarding Tift Regional's Hospital-Acquired Infection Rate

Request 6 of Medline's subpoena asks Tift Regional to produce "statistics and records created and/or generated regarding hospital acquired infections at Tift Regional Medical Center from 2008-2011." Tift Regional argues that this information should be considered privileged under the peer review statute, O.C.G.A. §§ 31-7-130, *et seq.* and/or the medical review statute, O.C.G.A. §§ 31-7-140, *et seq.* These two statutes have been recognized as placing "an exceedingly wide blanket of confidentiality over information generated by health care providers concerning the quality and efficiency of medical care." Doe v. UNUM Life Ins. Co. of Am., 891 F. Supp. 607, 609 (N.D. Ga. 1995). In Emory Clinic v. Houston, 258 Ga. 434, 434, 369 S.E.2d 913, 913 (1988), the Supreme Court of Georgia noted that the Georgia General Assembly has placed an "absolute embargo" upon the discovery and use of all proceedings, records, findings, and recommendations from peer review groups and medical review committees. The court in UNUM Life Insurance stated that

> committee proceedings – in all respects – are inviolate and nondiscoverable. The actual documents presented to the committee are privileged if they are sought from the committee. If the committee considered documents or testimony from outside sources …, then discovery of that information must come from the outside sources. In short, the peer review statutes confer upon

3

> peer review organizations the qualities of a black hole; what goes in does not come out, and, unless the information exists in duplicate in the surrounding orbit, nothing that went in is discoverable.

891 F. Supp. at 610.

The peer review and medical review privileges protect two types of information. UNUM Life Ins., 891 F. Supp. at 611. First, there is material that relates directly to a peer review or medical review investigation. Id. This material is always non-discoverable. Id. Second, there is information that would exist regardless of the peer review or medical review investigation, and this information is discoverable on a limited basis. Id. It cannot be discovered from the review group, but can be accessed from another source. Id.

In this case, Medline seeks information about hospital-acquired infections at Tift Regional. Tift Regional argues that this information should receive absolute protection under the peer review privilege because it was collected at the request of a peer review group. Medline argues that the information sought about infection rates is factual data from original hospital records, and should not be considered the product of a medical or peer review investigation. Medline relies on Cobb Co. Kennestone Hosp. Authority v. Martin, 208 Ga. App. 326, 430 S.E.2d 604 (1993), for the proposition that factual data is not subject to the peer review privilege.

Despite Medline's argument, the Court agrees with Tift Regional that the information regarding infection rates should be protected under the peer review

4

privilege. The information about infection rates sought by Medline is generated by Mary Key, a Certified Infection Control Registered Nurse at Tift Regional. (Joint Stipulation of Fact ("JSF"), Doc. 56, p. 7.) Nurse Key serves as a registered nurse and infection preventionist, as well as a member of the Tift Regional Clinical Monitoring Committee (the "Committee"). (JSF, p. 7.) This Committee, which consists of professional health care providers, including licensed physicians, nurses, and hospital administrators, was created to evaluate and improve the quality and efficiency of the health care services provided by Tift Regional. (JSF, p. 3.) According to the bylaws of the Committee, the Committee is considered to perform peer review and medical review functions within the meaning of O.C.G.A. §§ 31-7-130 *et seq.* and §§ 31-7-140 *et seq.* (JSF, p. 3.)

At the request of the Committee, Nurse Key creates a spreadsheet on a monthly basis, detailing information about infection rates at Tift Regional. The spreadsheet tracks infection trends and above-average infection rates. (JSF, p. 5.) It is reviewed and approved by the Committee on a quarterly basis (JSF, p. 5) and is used to develop and implement remedial measures to address concerns about the infection rate (JSF, p. 6).

To create the spreadsheet, Nurse Key reviews lab reports and medical records, and occasionally confers with patient health care providers. (JSF, p. 5.) If there is some indication that a patient has had an infection, Nurse Key, using her own experience, as well as guidelines developed by the Centers for Disease Control, makes a determination on whether the infection is hospital acquired.

(JSF, p. 5.) Nurse Key's initial findings and analysis are first set out in a worksheet, and then compiled into a spreadsheet at the end of each month. (JSF, p. 5.) The parties agree that "[t]here is no raw data compiled to produce the spreadsheet. There is also no raw data which shows rates of hospital acquired infections that exists apart from Nurse Key's work sheets and the spreadsheet." (JSF, p. 8.)

Based on the evidence presented in this case, the Court finds that the information sought by Medline is protected by the peer review privilege. The spreadsheet created by Nurse Key is generated at the request of the Committee and is prepared specifically for Committee review. Information is gathered from patient charts and independently analyzed by Nurse Key, a Committee member who works at the behest of the Committee. There is no raw data that is used to compile the spreadsheet. Without Nurse Key's analysis and evaluation, the spreadsheet and the information contained therein would not exist. Therefore, the information prepared by Nurse Key relating to infection rates, is privileged.

Tift Regional's Motion to Quash in reference to Request 6 of the subpoena is granted. The other nine subpoena requests have been resolved by the parties without Court intervention, and do not require any further analysis.

**SO ORDERED,** this 20th day of June, 2012.

*s/ Hugh Lawson*
HUGH LAWSON, SENIOR JUDGE

ebr